UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HARRY TAM,<br><br>    Defendant | CRIMINAL No. 21-10350-LTS |

**CORRECTED GOVERNMENT'S SENTENCING MEMORANDUM[1]**

The United States submits this Sentencing Memorandum in advance of the sentencing hearing currently scheduled for April 4, 2024, for defendant, Harry Tam. On July 6, 2023, the defendant pled guilty to all Counts of Indictment 21-103509-LTS in which he was named. Those counts included Count 1(conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine), Count 6 (substantive count of distribution and possession with intent to distribute 50 grams or more of methamphetamine), Count 10 (felon-in-possession of a firearm and ammunition) and Count 11 (Possession of Firearm with an Obliterated Serial Number).

Due to the quantity of methamphetamine involved in the conspiracy and the substantive count, the sentencing guidelines require a mandatory minimum sentence of 10 years in prison. Additionally, as a result of the additional two firearm charges and the Defendant's substantial criminal history, the draft pre-sentence report dated 11/08/2023 reports an adjusted offense level

---

[1] Undersigned counsel has been advised that the United States will be moving for a preliminary order of forfeiture of the following items: a White 2020 Lexus RX450H Sport Utility Vehicle (SUV) bearing VIN# JTJHGKFA5L2011348, registered to Harry Kiahai TAM and Jade T. CHIN and approximately $9,950 believed to be seized from the Defendant at or about the time of his arrest on the charges in the Indictment.

of 41 (44 minus 3 for acceptance of responsibility). With a criminal history of VI, the current guideline range is 360 (36 years) months to life.

With respect to the Defendant's Sentencing Memorandum, the government provides this Response in opposition to several issues raised by the Defendant as a basis for departure. At the time of this filing, the final pre-trial report has not yet issued. The government is, therefore, unaware of Probation's response to the Defendant's multiple objections. The government has, at this point, chosen to respond to those objections will it believes will most impact the final calculation. However, depending on the guideline calculation of the final pre-sentence report, the government may seek to enlarge this response to address those issues.

**I. Meth Departure Request**

The government has previously filed a motion in opposition to the Defendant's request to find a policy-based disagreement with the methamphetamine guidelines and simply depart to the lowest level. As in other cases including other defendants charged by this indictment, the government is requesting that the court reject the call to find a policy disagreement with the guidelines. The government is urging to calculate the guideline level of the methamphetamine involved as set forth by U.S. Probation in the pre-sentencing report. The claims of lack of empirical evidence are ironic in light of the lack of empirical evidence to support a downward departure to the lowest available level. So too, "the kingpin" argument -- which was only one consideration at the time -- should not displace the considered opinion of Congress and the Sentencing Commission that methamphetamine in its pure state represents overwhelming danger and harm. The argument that all meth these days is pure, and therefore it should all simply be discounted, makes very little sense in light of the empirical evidence that methamphetamine in its purest state represents enormous harm and danger. The irony of the siren call of lack of

empirical evidence is clear when there are no facts which underpin the call to discount the danger that methamphetamine poses. As the government has noted in its specific filing on this matter, while some courts have relied on the disagreement with guidelines, others have not, included other judges in this district.

The government is requesting that the court reject the policy-disagreement argument and agree with calculation of the guidelines as set forth in the pre-sentence report. After the guidelines are correctly calculated, the government, of course recognizes, the court's ability to vary and/or depart depending on other factors.

## II. Offender Characteristics

What you see and what you hear depends a great deal on where you are standing. It also depends on what sort of person you are.
- C.S. Lewis  (1989-1963)

In his sentencing memorandum, the defendant's view of his characteristics is relatively blinkered in that he focuses and places a great deal of emphasis on what has occurred during the time he has been incarcerated. His "extraordinary recovery" carefully avoids any reference to the fact that he is incarcerated, and that drugs are not necessarily as easy to come by in prison. In the past, it was clear the defendant was undeterred by the effect his drug dealing and usage had upon his personal and professional life. If there was a consequence that did not involve incarceration, the Defendant did not change his behavior. He could always enter yet another program, quickly relapse, and walk away within hours or days.

The benefits from the Restorative Justice program are encouraging but they are not necessarily, as the government understands it, meant to be a basis for a sentence variance. But Harry Tam is very good at taking advantage of situations where others – in this case, people who have been adversely affected by drug distribution and use -- are supposed to benefit but where

the defendant uses it to his own advantage. If the defendant's prior "relapses" were the only events at issue, the conversation might be different. But Harry Tam has been a criminal and has been involved in criminal activity, including violent and dangerous activity, for a long time. The idea floated by Dr. Gitlow that "with continued abstinences from substance abuse Mr. Tam is highly unlikely to further repeat as a criminal offender" is so dependent on the defendant abiding by whatever treatments might be provided in the future , so as to be essentially worthless and outside the realm of reality.

The Defendant also appears to have some difficulty with the truth. The fact that Tam is arguing he was not a leader of this conspiracy is evidence enough that he is not yet completely honest with himself or this court about his role. The following aspects of Tam's criminal behavior serve to focus Tam's myopic view.

## I. TAM's LEADERSHIP ROLE IN A DRUG TRAFFICKING CONSPIRACY

A review of the defendant's sentencing memorandum might lead one to believe that, when not under the influence of drugs, Tam was an outstanding businessman, a good husband, and father. If Tam's viewpoint controls, he's been a victim since the day he was born. He has attempted to push responsibility for his failures onto law enforcement; his co-defendants, and other charged and uncharged actors who appeared throughout the conspiracy. Even a co-defendant's dog does not escape his disparagement.

Tam touts his own education; his care of his other family members; his business acumen -- but what he has accomplished is all for naught when he seeks to avoid responsibility. By his own admission, he underwent rehabilitation numerous times and he failed. Now, for the first time in a long time, the specter of a very long period of incarceration looms.

It is government's view that Harry Tam previously failed at reform because he simply was not interested in giving up his criminal activity. He appeared to enjoy the control he had and the money he made. He saw his activities as something to enjoy away from his fraught domestic life. His claims about who he is now are at odds with the Tam who was then, both during and after the course of the wire interceptions. The defendant was an opportunist drug dealer and the leader and organizer of this conspiracy. Harry Tam did what is best for Harry Tam then now in this moment, which is to deny his own role in these crimes. What is concerning to the government about these claims is that Tam does not appear to accept responsibility for the totality of his crimes nor is he entirely honest with the court and himself. His insistence upon defining the conspiracy as what it is not—referencing a pyramid or a hub-and-spoke – is simply beside the point and the government is at a loss to determine exactly what this claim is. Does Tam mean to state that the conspiracy was a "loose association" and that was no agreement, that is, a specific agreement to distribute and to possess drugs? If so, that directly at odds with the charge and the factual statement related to Count One to which he pled guilty. This court has presided over one trial and at least eight pleas of guilty in this investigation. It is clear from the cumulative statements under oath that Count One properly charged a conspiracy – an agreement to distribute and possess. As is settled law, the heart of the conspiracy is the agreement. Additionally "[s]et[ting] up a network" to obtain and distribute drugs, "decid[ing] when and where sales would occur," "coordinat[ing] drug sales with [subordinates]," and deciding when and whether to extend credit indicate a leadership and organizational role. United States v. Rodriguez, 40 F.4th 117, 121 (3d Cir. 2022). That was precisely the role of Harry Tam.

Tam agreed he was guilty of conspiracy; specifically, that he was guilty of agreeing to possess and to distribute methamphetamine. Given the agreement between the members of the

conspiracy, and the evidence Tam may dislike the label, but the evidence shows he wore the mantle of leader.

The following charts and information provide the court with the picture of the Harry Tam who operated this conspiracy; who operated it well before the wire inceptions began; who accepted responsible for the money and for the drugs; and who directed other individuals.

Below are two charts which represent the numerous shipments and communications between the sender of the packages, co-defendant Nguyen, and Tam prior to wire interceptions in March of 2021.

Given the evidence, the government submits that the package sender was Tony Nguyen, who was located in California and who was identified on surveillance tapes in California.  Tam was here in Massachusetts and employed at Midas at that time.  It should be noted that co-defendant Marcus Leyden, whose name was used, was not an employee of Midas.  The government submits that the weights of the packages are consistent with drug shipment weights.

| SHIP DATE | SHIPPER INFORMATION | RECEIPIENT INFORMATION | DELIVERY ADDRESS | WEIGHT |
|---|---|---|---|---|
| 08/10/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Glen Davis[2] c/o Midas | Midas Auto - 120 Boylston Street, Brookline, MA | 3 lbs. |
| 08/25/2020 | Capital Printing 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto - 120 Boylston Street, Brookline, MA | 6 pounds |

---

[2] Glen Davis was identified as a Midas employee.

| | | | | |
|---|---|---|---|---|
| 08/31/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 6 pounds |
| 09/08/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 15 pounds |
| 09/18/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 15 pounds |
| 10/02/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 14 pounds |
| 10/15/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 5 pounds |
| 10/19/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 12 pounds |
| 11/03/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 6 pounds |

| 11/06/2020 | Capitol Printing - 2470 Berryessa Road, Suite A, San Jose, CA 95133 | Marcus Leyden[3] c/o Midas | Midas Auto- 120 Boylston Street, Brookline, MA | 5.2 pounds |

Chart Two shows the communications between co-defendant Nguyen and what was then identified as TT-1 for purposes of the wire, the phone that was used by Tam, and the related event.

CHART TWO:  Conversations between Tam and Nguyen

| DATE | ORIGINATOR PHONE | CONTACT PHONE | CALL TYPE | RELATED EVENT |
|---|---|---|---|---|
| 07/23/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | Unknown |
| 07/28/2020 | TT-1 | 408-455-9589 (NGUYEN) | Text | August 1, 2020, seized package |
| 09/04/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | N/A |
| 09/16/2020 | 408-455-9589 (NGUYEN) | TT-1 | Voice | Package sent by NGUYEN on 09/18/2020 |
| 09/26/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | Package sent by NGUYEN on 09/18/2020 |
| 09/26/2020 | 408-455-9589 (NGUYEN) | TT-1 | Voice | Package sent by NGUYEN on 09/18/2020 |
| 09/26/2020 | 408-455-9589 (NGUYEN) | TT-1 | Voice | Package sent by NGUYEN on 09/18/2020 |

---

[3] As noted in other government filings, co-defendant Marcus Leyden was a friend of Tam's from California.  At no time during this investigation was Leyden an employee of Midas.  The facts surrounding the multiple packages arriving at Midas which were unrelated to any work actually done at the Midas shop coupled with the other activities which clearly indicated that the Midas shop was the location where the co-defendants would meet and receive drugs.  This "business" severely undercuts the glowing work recommendation supplied by another Midas employee with the Defendant's sentencing memo. Clearly, that supervisor knew nothing about this activity and knew very little about the manner in which Tam's managed the shop.

8

| 10/01/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | Package sent by NGUYEN on 10/02/2020 |
| 10/0/3/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | Package sent by NGUYEN on 10/02/2020 |
| 10/05/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | Package sent by NGUYEN on 10/02/2020 |
| 10/09/2020 | 408-455-9589 (NGUYEN) | TT-1 | Voice | Package sent by NGUYEN on 10/02/2020 |
| 10/19/2020 | 408-455-9589 (NGUYEN) | TT-1 | Text | Package sent by NGUYEN on 10/19/2020 |
| 11/09/2020 | TT-1 | 408-455-9589 (NGUYEN) | Voice | Package sent by NGUYEN on 11/03/2020 and 11/06/2020 |

As a result of review of toll records for TT-1, the investigation revealed that TAM used TT-1 to send and receive electronic and wire communications to and from NGUYEN before and after *at least eight of the package deliveries* listed in Chart One.

Of particular note, on August 1, 2020, a package from Nguyen was sent to Midas Shop. It was determined that Tam used TT-1 to Text with NGUYEN to set up the drug distribution and discussed the August 2020 seized methamphetamine package. A search warrant was obtained by agents in the Northern California District which requested the contents of communications held by Apple Inc and associated with an Apple ID of NguyenTony87@gmail.com and a phone number associated with Nguyen. The retrieved contents of the communications were shared with DEA investigators here in MA.

On August 1, 2020, the package was seized by U.S. Postal inspectors while it was in route to Massachusetts. After the seizure, Tam texted a message to Nguyen in which Tam stated, "starting to get scared and depressed now" and "Mailman just came and went. Nothing smh."

9

Nguyen texted back asking "Came and still nothing?  My boy said same shit happened to him and got a delay and got his chain 2 days late in the postal."  Nguyen then texted Tam writing "I'm gonna try to ask for a front if anything if its gone so we can bounce back".  Tam texted Nguyen and told him that he called USPS and USPS was not sure where the package was. ("I actually called USPS and they aren't sure were [sic] it is either but they said they are way behind").

The authorized search of the package revealed that it contained approximately 1,094 grams of what was later determined to be methamphetamine.   In an undercover capacity, a United States Postal Inspector went to the Midas shop regarding the now "missing package."  A Midas employee immediately placed a phone call from his cellphone and then handed the phone to the Inspector and told him to speak with Tam.  The Inspector  observed that the screen read "Harry Tam 2" and displayed the phone number for TT-1. The Inspector then spoke with a person who he believed was Tam.  Tam stated that he was expecting a package from California and lied to the Inspector claiming that the package contained a car part. Tam further stated that he reported the package as missing to the USPS.  Tam told the Inspector another employee could assist him in obtaining information about the missing parcel.   After the Inspector concluded the call with TAM, he asked the employee for the tracking number for the missing parcel.  The employee showed the Inspector Mullen a text message on his phone from the contact, "Harry Tam 2," which listed the tracking number of the missing parcel as EJ367107801US (the tracking number of the August 2020 Seized Methamphetamine Parcel). Later that day, the Inspector listened to the audio recording of an August 1, 2020, call from a person identifying himself as "Jacob Rodriguez," inquiring about the missing August 2020 Seized Methamphetamine Parcel. After listening to the call, the Inspector believed that the caller was the same person with whom

10

he spoke on August 4, 2020, who identified himself as Tam, who was using TT-1, and was trying to locate the August 2020 Seized Methamphetamine Parcel.

At this point during the investigation, Nguyen was identified as a middleman/supplier. Tellingly, the evidence shows that only Tam dealt directly with Nguyen.

There was also another supplier from California, co-defendant and current fugitive Colin Hea. In early March of 2021, Tam told an individual, believed to be Heather Lasota, an associate of Hea's, that he was sending money.[4] Later Tam and Heather talked about a shipment. Heather told Tam that it was being sent tomorrow and that he should receive it on Saturday. Tam asked about the quantity and if it was 2 "keys" which investigators believed to be a reference to kilos.

On or about March 11-12, 2021, Tam called co-defendant Vincent Duong and asked if he had received a package. Duong said he had not. Tam told Duong that he [Tam] did not get a chance to talk to him about it. Tam said, "right now its still being sent to Ricky." [Wire session 89]. Law enforcement officers observed a Fed Ex truck arrive at Duong's address on that day. Later that day, after the package was delivered, Duong was stopped by law enforcement officers who recovered a Fed Ex package addressed to "Ricky Diorio Duong" at 37 Kings Road, Canton, MA. The package was found to contain nearly 2 pounds of methamphetamine.

After the seizure, Tam and Hea had several conversations in which Hea told Tam that he did not believe the story about the drugs being seized by law enforcement. In one of the text messages from Hea, he told Tam, "[w]e did our part so u get to do ur part and send us our money cuz were not discounting and ur not getting out of paying either." [Wire session 177]. Hea later

---

[4] All of the information related to Hea has been culled from the wire transcripts.

followed up with the message "[t]here is n[o] point in calling or face timing cuz everything u gonna say is bullshit. All we need is a tracking number for the money and I'll see you in 3 days." And finally, a text message from Hea to Tam: "Where is the money Harry u have already insulted me *by not sending our money per our agreement*." [emphasis added, wire session 213].

It is clear from these exchanges that Tam was the person who placed the order, told others where to send it, and was responsible to supply the cash payment for the product. That is not the role of an individual who is simply a participant in this drug conspiracy. This is a leader and a director of others.

### II. MONEY CONVERSION INTO DRUG WEIGHT

Tam was arrested on May 11, 2021, after being found at his home and after his wife had obtained an initial restraining order and then had it extended. Tam now argues that the $95,450.00 was "family cash" and not from drug proceeds. He claims that the money represents family gifts and occasional "cash savings by the family over the decades." He further claims that his oft-estranged wife, Jade Chin, describes the circumstances in her sealed exhibit. The defendant states "[t]here is no reason to disbelieve Jade's statement." In fact, there are multiple reasons to disbelieve both Jade Chin and Harry Tam in this regard.

On April 30th, 2021, Jade Chin called the Boston Police Department to report that Tam was in the home in violation of a restraining order. On that day, BPD officers arrived at the scene. Officers discovered that a copy of the Abuse Prevention Order, (Temporary), was attempted, but not served in hand, to the defendant on several occasions. On arrival, officers spoke to the complainant, identified as Jade Chin, who stated her husband was upstairs on the

third-floor sleeping, that she had a restraining order against him, and that she would like him removed.  Officers informed Chin that the defendant, had not been served with the Abuse Prevention Order in hand, although several attempts were recently made. Officers also informed Chin that it appeared that the temporary order had expired on 4/22/21. Chin, however, provided the officers with an email containing the Modified/Extension of the temporary order, modified on 4/23/21, and extended until 4/22/22.  Officers found Tam upstairs and informed him that the Order had been extended and that he had to leave.  Later, Tam was intercepted on the wire and investigators learned that Tam had multiple firearms and drug proceeds inside of 23 Mansfield Street, Allston, MA.  [Wire session # 5466].   On the wire, Tam told the individual he spoke with that he was worried about his gun and his money inside the house.  "Hey, listen there's some... I need... I need... I have a need. The need that I have is I need to know *that my shit is safe in the house*. I know I've asked and you guys keep saying it is, but I, I...Based on how angry she is... I need to know. *I need to know that... um, my money and um, specifically, my guns* are not gonna be fucked with as I go to the program."  Tam then said, "And, and, and I do need... I need to know it's like $210,000."

What is telling is that Tam speaks of this as "his money"  and "his shit."  There is not one mention that this is the result of legitimate savings, or that this is allegedly money provided for his children by other family members. And does not act like this is legitimate funds or money earmarked for his children.

The defense argues that "Tam's safe was holding no drug proceeds." One would expect, he claims, to find  a significant accumulation of cash and valuables.  The government is at a loss as to how to define $95,000 in other words.  It was a large amount of cash along with nine illegally possessed firearms including one with an obliterated serial number.  These items could not be seen as

anything but drug proceeds or instruments of drug trafficking.   Def. Motion, p. 19, is directly contrary to the facts.

When federal agents arrived with a search result for the premises after Tam's arrest, Chin refused them entry, telling them there were no guns in the premises.  At the conclusion of the search, during which the multiple firearms and the cash were located,  a TFO informed Chin that the search was then concluded.  The TFO informed Chin that several "guns" were found within the residence *and* a large sum of US currency.  Chin asked where they were located and was informed that some were located in a safe within her own bedroom closet.  Chin acknowledged her prior knowledge of the existence of the safe in the closet wall but indicated that she had not gone inside of the safe in a long time and *did* not know what Tam kept inside of the safe. Chin made no mention of any money; made no legitimate claim to the money; or even that she was aware the money was in the safe.  She never told the officers what is now telling the court some three years later.

The government suggests that Chin may very well have been aware of the contents of the safe.  That only makes sense because  Tam's apparently believed that she could do something with the contents of the safe. That is why he was desperate to get into the house.  Chin, on the other hand, distanced herself from what she apparently knew was a large stash of illegal firearms and/or illegally obtained funds.  The government notes that neither Chin nor Tam made any claim of ownership of the funds in response to the forfeiture by DEA.[5]

---

[5] Chin requests the return of the family to her and her family who, she claims, are now suffering.  Chin's failure to the respond to the forfeiture amounts to her waiver of any claim to the funds. Additionally, the government notes that after Tam's May arrest and after the seizure of the funds, the Financial Crimes Enforcement Network filed a report regarding a personal property transaction between Jade Chin and Post Motors doing business as Lexus of Watertown. The report noted a transaction date of  July 6, 2021, at which time Jade Chin paid $35,900 in cash to Lexus of Watertown, MA. The cash was described as having $8,000 in $100 dollars. Apparently, monies collected were not just for her children.

To argue that a large amount of cash was located with nine firearms belonging to a felon who was seen and heard dealing drugs for months begs belief.

Tam further argues that his own successful business wherein he claims his had a six-figure yearly earning which allowed him to stash cash.  He provides very little, if any, verifiable or credible information, in this regard.

However, during the investigation, Grand Jury subpoenas were served on financial institutions with which Tam did business.  A financial analyst for the United States Attorney's reviewed the information and prepared a summary of his financial activity which is included below:

- Residence = 23 Mansfield St, Allston, MA 02134 (owned by Min Xin Chin)

- Wife/significant other = Jade T Chin (tax return payable to both Tam and Chin jointly)

- Vehicles – both registered to Tam and Chin, 23 Mansfield St, Allston, MA
    - 2020 Lexus RX, VIN# JTJHGKFA5L2011348v (see pymt from BoA *9068)
    - 1993 Jeep Wrangler, VIN# 1J4FY29SXPP222480

- Bank accounts[6]
    - **Bank of America checking account:**  Records were obtained from 12/16/17 (beginning balance $21,409) through 10/19/20, at which point the account had a balance of $80,779.  During the approx. 3-year period reviewed, deposits into the account totaled $331,531.  Deposits included payroll from Midas / Kentco South ($197,526), cash ($75,778), P2P transfers ($30,089), state and federal tax returns ($11,627), Mass Unemployment, June-July 2020 ($5,092), and checks that may have been diverted from Midas, either payable to Midas or checks issued by Midas to third parties ($2,881).  The P2P transfers included transfers conducted via Venmo, Cash App, Zelle, PayPal, Stride Bank, Google Pay, and GreenDot.  Disbursements made from the account totaled $272,162 during the period reviewed, which included payments for BoA and JPMC credit card accounts ($133,860), Venmo transfers ($34,401), cash withdrawals ($22,320), a payment on 7/6/20 to Lexus of Watertown ($19,488), PayPal transfers ($11,564), Zelle transfers ($4,903), and Cash App transfers ($4,693) .

    - **JPMorgan Chase checking account**.  Records were obtained from inception of the account ton 6/14/19 through 9/25/20, at which point the account maintained a balance of $15,008.  Deposits into the account during the period reviewed totaled $20,380, which included Venmo transfers ($8,354), cash ($3,450), Midas/Kentco South payroll ($3,250),

---

[6] Identifying account information has been redacted.

  Comm of Mass tax refund ($676), and Zelle transfers from Ashley Padova ($400). Disbursements totaled $5,372, which included payments to JPMC credit cards of $4,972.

  - **JPMorgan Chase savings account**. Records were obtained from inception of the account on 6/14/19 through 10/13/20, at which point the account maintained a balance of $24,000. Deposits totaled $24,142, including cash deposits of $21,089. The only disbursement from the account was a transfer to Tam's JPMC checking account *4599 for $142.

  - **Acorns Securities investment account**. Records were obtained from January 2019 through May 2020, at which point the account had a balance of $3,050.

- Credit Card accounts

  - **Bank of America**. Purchases made during the approx. 3-year period totaled $53,223. Purchase activity primarily ordinary living expenses. Notable purchases included the following:
    - 2/10/20 – 2/13/20 – charges in Tampa, FL (travel)
    - 6/30/20 - $873.97 at JSD Supply (firearms supply store)

  - **JPMC.** Records were obtained from 4/13/19 through 10/12/20. Purchases made during the period totaled $57,889. Purchase activity primarily ordinary living expenses. Notable purchases included the following:
    - Numerous AirBNB charges throughout 2019 and 2020.
    - Multiple airline charges, primarily JetBlue, to Tampa, Sacramento, and San Jose
    - Numerous USPS purchases in Brookline, Allston, and Boston
    - 4/19/19 and 5/19/19 – charges at the Glock Store (858-569-4000)

  - **JPMC**. Records were obtained from 4/11/19 through 10/10/20. Purchases made during the period totaled $7,551, which included charges with Amazon, Uber, and Lyft.

- Mobile payments / P2P accounts

  - **Square Cash App / Sutton Bank prepaid card**. Records for the account were obtained from 6/2/19 through 10/19/20. Only two purchases were made from the account, both on 4/29/20, one of which was $822 paid to F and F Firearms in California.

  - **Venmo account**. Records were obtained from June 2020 through October 2020. Approved deposit transfers into the account totaled $7,980, including transfers from Mila Tam ($7,000) and Robert Ostrander ($300). Approved disbursements from the account included transfers to Tam's JPMC, payments to Tony Nguyen ($2,700), Leon Tam,

> referencing property tax ($1,094), Frances Tam ($569), Robert Brenner ($550), Amantha Beliard ($100), and Ashley Padova ($62).

The analyst also reviewed monies from Yim Lee 401k loan for $30,000 was issued on 9/11/2017. The analyst was not able to see if there was a corresponding $30,000 cash withdrawal but noted that the 401k loan clearly was not in the form of cash.

Additionally, between April 2018 and August 2020, there were cash deposits into Tam's two bank account from unidentified sources totaling approximately $100,000, along with cash withdrawals of approximately $22,000. Therefore, there would have been cash deposits of approximately $78,000 of unexplained cash. As a result of these transactions, any explanation that Tam offers about the origin of the monies would have to account for $78,000 in addition to the $95,000 seizure for a total of $173,000.

As a result, Probation correctly converted the money into drug weight and Tam should be held accountable for such.

### III. HENRY VUONG'S DRUGS

Tam argues that the drugs located in the vehicle driven by co-defendant Henry Vuong belonged to the passenger in the vehicle and therefore, should not be attributable to him as part of the conspiracy. Tam relies on phone calls he had with Vuong was arrested. What is notable about those conversations was that Tam apparent worry that Vuong would cooperate and identify him. Tam claimed he paid $10,000 for an attorney for Vuong because, Tam claimed, the attorney would not let an individual cooperate. Once again, Tam demonstrated that this situation was all about him.

As this court knows, Henry Vuong admitted under oath both to his participation in the conspiracy and to the substantive possession and distribution of the drugs. Moreover, Vuong

agreed with the statement of relevant facts that the evidence would show that on September 9, 2020, a FedEx package, consistent in weight with numerous other packages, was sent by Nguyen to the Midas shop where Tam worked. Nguyen has been identified as one of the suppliers for the conspiracy and has admitted his role as a supplier to this Court. The next day, Vuong arrived at the Midas shop after it was closed. Vuong carried a black bag and met with Tam and others in the parking lot. The group went to a hotel across the street. Later, Vuong got back into his vehicle, still carrying the black bag. He was later stopped, and the bag was found to contain methamphetamine. He initially admitted possession to the arresting officers, then denied possession in phone calls with Tam while Vuong was in jail, and finally admitted to this court under oath that he was the one responsible for the drugs. It should be noted that during the jail phone calls with Tam, Tam urged Vuong to tell the officers that the drugs belonged to the woman in the car because the drugs were found on her side of the vehicle. There is more than ample evidence to show that the drugs possessed by Vuong were obtained as part of the conspiracy which involved Tam.

### IV. Government's Recommendation[7]:

The government has obtained approval to seek a reduction of 25%. The reduction allows the government to recommend a sentence of 22 and a half years to recognize the appropriateness of a departure for some aspects of Tam's work and life. As a result of the foregoing, the government will request a sentence of 270 months, to be followed by five years of supervised release; a fine of $400 dollars. Criminal forfeiture of the firearms and the money identified in the

---

[7] The government intends to seek leave to file a further Response under seal in response to Defendant's sealed Reply to the Government's sealed Response to Court Order Regarding Discovery.

Indictment will not be sought as the items were previously administratively forfeited by DEA and ATF as set forth in the Notice to the Court Regarding Forfeiture order [Dkt. 610]. Criminal forfeiture will be sought for the items described in FN 1 of this response.

Given the totality of the circumstances including the Defendant's criminal behavior in this case, his leadership, his criminal history, his multi-gun possession after being convicted previously of a felony, and other factors addressed herein, this sentence is "sufficient but not great than necessary" to promote his rehabilitation.   18 U.S.C. § 3553(a), (a)(1).

        Respectfully submitted,

        JOSHUA S. LEVY
        Acting United States Attorney

By:    */s/ Nadine Pellegrini*
        Nadine Pellegrini
        Amanda Beck
        Assistant United States Attorneys
        617/748-3261

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Nadine Pellegrini*
Nadine Pellegrini
Assistant United States Attorney

Date: March 26, 2024